Judge Cudahy is going to participate by phone. Hello. Dick? Hello. Yeah. Oh, good. And the lawyers are here, so we'll start. Mr. Malk? Okay. Thank you, Your Honors. May it please the Court what this case is about, what's at stake, and the legal issues. This is about the aldermanic privilege system that gives aldermen absolute control, abusive control, over land use and religious ministries and allows them to try and overwhelm a small inner-city ministry. What's at stake is not only the civil rights of all the people of World Outreach and their children, the teenagers at risk, the near homeless that are put out on the street because the city won't allow, or the alderman won't allow, and the city empowers the alderman to keep them down. The legal issue is whether the term substantial burden should be read to include the cumulative effect of numerous city actions, the totality of those effects. This court in World Outreach 1 ruled that the burden should be measured according to the substantiality of the burden should be measured according to the capacity of the group being burdened. The district court seemed to slide right past that standard and isolate one incident, which the court had mentioned as a substantial burden, the frivolous state lawsuit pursued by the city, and say that was a substantial burden, but atomized and separated all the other things that the city did and didn't look at those cumulatively. I wanted to ask you if you think that using the property as a church is the same as renting the property out to others to use as a church, because it seems that the YMCA was not using the property as a church, but was simply renting out to church groups, so did that particular use come within the lawful non-conforming use that runs with the land? Yes, that's an excellent question, and I'd like to clarify that. Principal use is community center and single room occupancy. That's the use for which the building is always put and what it was used for. In the record, there's an affidavit from Pastor Blossom knowing of at least five different churches that had met there on Sundays. The city code is very clear that you can have accessory uses, and a community center might have Boy Scouts, Alcoholics Anonymous, community groups, political groups, birthday parties. They don't have to get a special use permit just because someone is turning 12. The church meets in a gym. There's no sanctuary. This building is two gyms, a swimming pool, offices, a cafeteria, and 168 rooms. It's not a church. The church is an accessory use. Even to this day, the city, in its reply brief, says, oh, they had to get a special use permit for a church. Church was never intended to be a principal use. It was an accessory use, clearly allowed in every YMCA, and most hotels have religious groups meeting. Speaking of YMCA, what differences did your client envisage? Differences between world outreach use of the building and how YMCA had used it? Well, not much, really. Essentially, as a community center, that term implies all the different activities that a community center would engage in and host. One of the things, for example, that she mentioned was a dance studio for people to come in, and that's part of physical exercise. Another was computer studies. Right now, they run an after-school program for about 100 kids that come in and they study or they can work on the computers there. But wasn't world outreach planning some physical changes? No. World outreach had enough money to buy the property and then enough volunteers with some additional money to try and rehab the units. There was never an intention to add a new wing or... Well, was it because of the rehabilitation plans? Was that why the city asked for building plans? No. The city asked for building plans, we think, just to harass... Or drawing plans, whatever they're called. Building plans. No, no. They said, you have to prove what you intend to do instead of just declare what you intend to do. And they already knew, and World Outreach One, which is the law of this case, said they already knew from voluminous records that it was constantly licensed as an SRO and community center for years. They took a rather novel, maybe ingenious position, oh, you have to prove what you're going to do in the future. No. All we need to do... What do you have to prove? We just have to declare our use and then they license us for that use. We get an SRO license and if we open a grocery store there, they come in and say this SRO license doesn't cover a grocery store. We declared our intention 26 times, and that's on pages, in our brief, pages 26... I think you have to do more than declare your intention. Where do you get that from? Well, because legal non-confirming use depends on what's already been established. What do you mean, already been established? That is, it was legal at one time and then the zoning laws changed. That makes the use legal but non-conforming to the current zoning code because of a subsequent change. In footnote 8 of the district court opinion, the court states that the record does not on August the 5th of 2005. Where is the best evidence in the record telling us when World Outreach applied for those licenses? And I am looking for a specific record site. Okay. Well, let me start with the district court opinion. On page 6, the court says the first time we ever applied was February 2nd, 2007. And she uses that to say you really weren't trying to get an SRO. But on page 11, same opinion, Judge Lefkoe says the church first applied in November 2005. Now what happened at the re-zoning, the hostile re-zoning of the city, the church attorney said we have a legal non-conforming use to continue as an SRO and a community center. The church sent several representatives down who filled out the papers and then they apparently got round filed by the zoning department. There's a place where you fill them out and it took us three times sending people down there to figure out what was happening, that we'd fill out the application, it would never come back, and we have testimony from our paralegal that the zoning department official told her, well, it came up to us and we never acted on it because a special use permit was required. So the city empowers these aldermen to put a hold on things and to hostile re-zone. Now what's the basis of that allegation? Which allegation, Your Honor? The one you just made. You just said the aldermen can put a hold on this. Yes, the city admits that. As a matter of fact, they admit that it's done routinely. They empower these aldermen to put a hold on any applications and permits when they assert there's a pending zoning change. And that's what happened to us. And there's no obligation on the alderman and the alderman never removed the hold. So you've got a computer system that's constantly rejecting our applications. Our applications came early and often there's four records of applications. And the city knew what was happening here. They just didn't want to deal with it. They had briefs. We had legal briefs in which we asserted this. And in May of 2006, the city finally gave up and said, okay, we're going to drop our case against you. Then when we filed our counterclaim in that case, we had to put it in a new case. The city removed it to federal court, which is this case here. And they took up the same position. They renewed their opposition because you need a special use permit. So they didn't listen to the building code attorneys. They just went off on their own and reasserted the same legally frivolous claim. Now Judge Lefkoe only looked at the frivolous lawsuit of the state court. She missed the point that the city renewed that argument with their federal attorneys and said in their briefs, we believe they need a special use permit. And they had briefs from us saying this is illegal nonconforming use, it's zoned manufacturing, it's legally impossible. But they continued. That's why it's a little aggravating to read their response brief to see what do you have to show to show a continuing illegal use? That I think is the essence of the case. We haven't talked about that. The licensing, continuous licensing as an SRO is prima facie proof right there. What do you mean by that? Well, it's licensed as an SRO and it's inspected two or three times. It's licensed to the YMCA. Yes. And that's what we have to show, that it has been used as illegal nonconforming use and we intend and we declare our intention to go ahead. The city can come by three months later or six months later and say you don't have an SRO here, so your license is no good. What is your best evidence in the record that there was an agreement to house the Hurricane Katrina refugees? Because it all seems very tentative and it also appears that the building would have just been placed on a list of available housing and that is only if it passed a HUD Section 8 inspection. So where in the record will we find evidence that the property would have passed an inspection and that there was a definite agreement? Where's the black water? Well, Ron Carter from the Illinois Department of Housing Services recognized that it was ready to go and it was ready to be put on the list. Well, ready to go is not a fait accompli. Well, no, it needed an SRO. Except for the SRO permit, we were going to put it on the list, he said. Well, on the list, so we don't know how much you might have made. You might have made zero, you might have made a million. Well, that's true, but in estimating damages, we have the facts that there are up to 10,000 evacuees in the city. We're talking about housing, 168. And Ron Carter testified that ours was a plus because it had food in addition to housing and we had gyms and exercise facilities. And generally you look at vacancy rates, 5%, 10%, and get a reasonable vacancy rate, but this property was to be rented out. And we're asking the court to... It was ready to be rented out. I thought it was in poor condition. Not really. It was not a brand-spanking-new property, but it passed many inspections and the trial court apparently conflated the fact that there'd be some building code violations. And you have 168 units, Your Honor. Some of them are going to have a broken toilet and maybe there's a ripped... Were there more building code violations than the YMCA had? No. What I'd like to know is what is legally required to prove prior non-conforming use? And why do W.O.'s assertions satisfy or fail to satisfy that standard, whatever the standard is? I haven't heard the answer to that. The proof was all in the city records. They had numerous inspections showing it was used as an SRO. They had numerous continuous licenses as an SRO. We had affidavits from Pastor Blossom that it was used as an SRO. And we have 168 units.  What was legally required to prove prior non-conforming use? You haven't answered my question. Well, maybe I don't understand it, Your Honor. The evidence... Well, you're relying on that state of fact, but you haven't told me what is required to prove it. Well, I thought your position was that no one doubts that YMCA had illegal non-conforming use. What? The YMCA? Yeah, but I thought your argument, Mr. Mauck, was that since the use contemplated by the World Outreach Center was almost indistinguishable from that of the YMCA, it would also be illegal non-conforming use. Yes. Is that your argument? Yes. I'll reserve the balance of my time. Okay. Thank you, Mr. Mauck. Mr. Hubert? Good afternoon. May it please the Court, I'll begin today by addressing the District Court's proper grant of summary judgment to the city. I'm going to begin, if you don't mind. Sure, that's fine. Why did World Outreach have to do anything more than the YMCA would have done to procure the licenses for the community center and SRO? In other words, what in the city's ordinances required them to do anything more than the prior owner? Well, Your Honor, what requires that is that there's two steps to the test for illegal non-conforming use. The first is that the prior use by the prior owner was illegal non-conforming use at the time that that was used. I concede that, surely. I don't believe there's been a dispute about some of those uses. Oh, you think the YMCA was an illegal property owner? Is that what you're saying? No, Your Honor, but we don't have... But what? But the church... We don't agree with the plaintiffs, for example, that the use of the church, renting the church out... But you agree that the YMCA was illegal non-conforming use, don't you? For the... Or do you want to take that back? No, Your Honor. We don't... We concede that the YMCA's uses as a community center, a fitness center, an SRO... Was it illegal non-conforming use? Were legal non-conforming uses. That's correct. So what's the difference between what it did and what World Outreach Center did or does? Well, the difference, Your Honor, is that now you have a new owner who's come into the licensing branch of the city and has applied for a license application, and that first step, the zoning administrator checks for zoning compliance, and the zoning administrator sees that the building is not zoned for the use that's permitted, and in that case it becomes a plaintiff's burden to... Wait, I don't understand that. There must be lots of properties that are legal non-conforming uses, and you're saying that every time there's a sale to... It's sold to another owner, you have several years of figuring out whether it can remain or what? No, Your Honor, when an applicant... Is there something unusual about this situation? What was unusual here was that when the denial occurred of the license applications from the zoning administrator in August 2005 and November 2005, there was no assertion... Why was it denied? It was denied the first time in August because... Why? For a special use permit in August because the fitness center required a special use permit at that time, which was correct. And the second time from the record indicates that the SRO license was denied because it also required a special use permit. Now, that was an error at that time because the zoning had changed and it wasn't recognized, but it was an immaterial error because the current zoning didn't allow a special use permit at all, so the only way to get past that was to establish legal non-conforming use. But what didn't occur was that the plaintiffs didn't actually even assert legal non-conforming use at that point to the zoning administrator. It just went away. I am missing something. I am really missing something. In other words, here's what I'm missing. Why was it not enough to apply for licenses to use the building the same way it had always been used? Because I would think that applying for the license would demonstrate the intent to use the building in a particular way. Well, again, Your Honor, when a new owner comes in and applies for a license, the first thing that if there's a check and the zoning administrator recognizes that the zoning is not there, then it's the applicant's burden to establish legal non-conforming use. And here, the zoning administrator wasn't even made aware of that assertion of legal non-conforming use by the applicant until the litigation had proceeded, and that's when the issue came to the fore and the zoning administrator was told they're asserting legal non-conforming use here, and the zoning administrator told the lawyers for the city, well, we asked for plans. I didn't understand. Didn't these bureaucrats understand that one religious organization, not a church exactly, but a religious auxiliary or something that has this facility with a swimming pool and a gym and so on, was selling to another essentially identical religious organization, slightly different, I don't know, faith or something. They're all Christians. So why wouldn't they just assume, yeah, it's the same thing. I don't understand. What did they think? Well, Your Honor, as a matter of... Like selling to the Church of Satan, right? No, Your Honor, as a matter of practical efficiency, for example, in 2005, there were 16,000 or more zoning applications that went through the licensing branch, and to expect that the zoning administrator in every single one of those applications is going to recognize who the prior holder of the property was What do you mean recognize who the prior... They didn't know it was the YMCA? Well, there's no evidence in the record at all. Oh, come on. They don't know who owns it? There's no evidence in the record other than the fact that there was a zoning check and that the zoning came back as not zoned. Now, please, they did not know who the prior owner was? They'd never heard of the YMCA? No, there's certainly... She'd been there for decades? There's certainly no evidence that the plaintiffs asserted to the zoning administrator in response to the denial based on the zoning that the YMCA had the property and that it was... Yes, but you're telling me that the city didn't know the YMCA was the owner. I'm saying that the zoning administrator... Well, is that what you said? That the government didn't know that the YMCA was the owner? I said that in this licensing... Well, would you answer my question? Other people at the city may have known, but the entity charged under the ordinance with administrating this process of checking for licensing compliance, there's no evidence in the record that at that step that those people were told that this is the YMCA and we want to do the same thing. It wasn't until later on in the litigation when litigation occurred more than a year later or later on in 2006. But surely they know who owns all the properties. There may be records of that, but there is certainly nothing in any of the ordinances that requires... It sounds like complete bureaucratic incompetence. Well, Your Honor... I also, you know, I find that suit you brought extremely offensive. You've got 72 or 74 paragraphs of accusations. That just looks like harassment to me. Well, respectfully, Your Honor, everything in the record indicates that the lawsuit was brought based on the inspectors that went out to the property and reported back that there were uses of the property that were in violation of the zoning. The inspectors reported back that there were those violations and then the zoning enforcement people followed up with a lawsuit to enforce the zoning code. You know, help me out with this then. There's this seven-month delay at the end of the license process where the zoning department had signed off on the licenses yet did not issue the licenses. I'm speaking here of that delay between January 31st of 2007 and August 3rd of 2007. And the city says that it was waiting for inspections. The plaintiff says there were no inspections other than a check for an occupancy card. So what happened here? I mean, is there a fact dispute that must be resolved on this point? Respectfully, Your Honor, there's no fact dispute. If you look at the record at record document number 58, that is the TRO motion that was filed by the plaintiffs at that time, you'll see that the plaintiffs actually alleged there that there were five inspections after the zoning approval that had to occur and that the last of those inspections occurred on July 17th of 2007. And at that point, because the license didn't issue within a week or two of that, the plaintiffs filed a TRO. But the plaintiffs themselves alleged that there were five inspections that had to be scheduled and had to be completed and that they didn't finish until July. And in their own amended complaint, I believe it's paragraph 46 of the amended complaint, plaintiffs themselves alleged that the reason that there was a delay until August was that they needed time to get the building ready to pass those inspections because of, they alleged, because of the delay in the licenses that they hadn't done the work of until that point. So the record is clear that there were, in fact, inspections outside of the zoning process that had to occur. Zoning is step one in getting the license and once that's signed off on under the ordinance, there are other inspections that have to take place for a business license to issue. Now, I have one more question because on page 27, at the very top of the page, of the combined response reply brief, the plaintiff points out that in the city's brief in the 2009 appeal, the city admitted that it required a special use permit. Now it seems the city has changed its tune. Why shouldn't the city be held to its earlier admission if there was such? Respectfully, Your Honor, a few things. One, this was all in the context of the allegations of the motion to dismiss and briefing that issue. But two, what the brief actually says is that the only reason that the license didn't issue earlier was because plaintiffs did not either, one, apply for the special use permit when they could have, or two, take a zoning board of appeals appeal to dispute the need to get one. And that's correct. If plaintiffs had done either one of those two things, they could have asserted their legal nonconforming use in the regular licensing process and could have gone about appealing the denial on the ground of legal nonconforming use, but they actually didn't do that. They didn't actually assert legal nonconforming use at all during the licensing process in August 2005 or November 2005. Moreover, the record is clear that when plaintiffs reapplied for their license for the fitness center and for the SRO in May 2006, that at that time the licensing people told them they needed to see a zoning inspector who asked for plans for the building. There's no indication that in May 2006, in that reapplication process, the special use permit was ever asserted by the zoning administrator. In fact, all he asked for were plans for the building, which were not submitted until the litigation proceeded, and the request was made again in January 2007. What is legally required to prove prior nonconforming use? Well, Your Honor, the ordinance doesn't actually define what it is, but here it was clear on this record that the zoning administrator did ask for plans in May 2006 to see what the proposed use of the building was by the current owner, and that once the zoning administrator received those plans and understood that the plans were asserting legal nonconforming use, the zoning administrator reviewed the plans and said, yes, this looks like a legal nonconforming use as the plans appear, and signed off on it. Now, the problem is that, as was discussed earlier, when you have proposed uses such as a community center, which could entail any number of things, and particularly where plaintiffs were proposing all sorts of uses before, including turning some of the building into office spaces, dance studios, and things like that, it's perfectly rational, we believe, for the zoning administrator to ask for plans of the building to see that the building hasn't changed in a way that doesn't indicate that the building will be used for something other than a legal nonconforming use. Well, that may all be true, but what is legally required to prove prior nonconforming use? Some evidence that... That's a general question. Please answer it. Some evidence that the building will continue to be used for a purpose that conforms with the prior use. Some evidence, or conclusive evidence, or what kind of evidence? Well, evidence that indicates... There's no specific definition, but evidence that indicates that the use that is proposed will be the same as the prior use. It seems to me that question was never answered in this litigation. Well, the standard was never clarified, Your Honor, but the fact that the plan satisfied the zoning administrator shows that there was a possibility of doing that. The plans were requested in May 2006, and they weren't submitted until January of 2007, and then within days, the zoning administrator signed off on those plans as demonstrating legal nonconforming use. What do you think... No, you're just saying if you supply plans, that satisfies the requirement, which may or may not be true, but what else is available? Or is that the only way to answer the question? Well, I believe that supplying plans that demonstrate that the building hasn't been changed in a way that indicates a use that's not legal nonconforming is indeed a way to satisfy the standard of legal nonconforming use, Your Honor. Whether there are other ways to do that, I'm not sure, but on this record, it's clear that that satisfied the zoning administrator that legal nonconforming use had been demonstrated. What do you think the plaintiffs would have to prove in order to establish a substantial burden? In this case, Your Honor, the plaintiffs would have to prove that the process which the city applies or uses for these type of business applications, the zoning check in that process somehow renders their free exercise of their religious beliefs effectively impracticable. And again, here, if plaintiffs had alerted the zoning administrator earlier to the idea of legal nonconforming use and had submitted the plans when they were requested in May 2006, they would have been able to move forward in the process and had gotten their license as was demonstrated by the fact that they got it within days of submitting those plans in May. Well, that's 2006, but what about 2005? In 2005, again, if the plaintiffs had alerted the zoning administrator in response to the denial of the license application immediately that they believed they had legal nonconforming use, as was their burden under the ordinance, then they could have moved forward with proving that. And if that failed, then they also had a Zoning Board of Appeals appeal open to them, which under the ordinance is available to anyone aggrieved by a zoning administrator's decision. How do we deal with the fact, if it is a fact, that the alderman had a, shall we say, one of his friends who was very interested in that particular property and seems to have done everything possible to keep World Outreach from getting to its goal? Well, Your Honor, if I could address that in a couple of steps. One, I would like to clarify one thing related to that that was said in the opening argument, and that is that the city and the alderman did not admit that the alderman interfered with the business license application process. In fact, Alderman Beal's deposition testimony... Well, didn't he, in effect, force up the price to World Outreach from $300,000 to $380,000? And what he did was, there's indication that he encouraged the bidding to be reopened to allow for a new development. Right, so that pushed up the price, yes. Is he supposed to be involved in things like that? Is that how your office operates? Well, Your Honor... The alderman come in and say, well, I have my provident real estate company that really wants this, so let's reopen the process. Well, the alderman's concern, based on his testimony, was with the financial ability of whoever took the building to rehabilitate it and keep it running and not for it to fall into disrepair or to fall vacant. Well, they had $80,000 extra that they could have used for that that because of his, I don't know if we call it interference, I mean, I don't want to cast dispersions, that they would have had to rehab that they now had to use because of the reopening of the bidding to pay for the building which they thought they had bought. Well, Your Honor, for one, none of this falls within the purview of RLUIPA. Whatever else falls within the purview of RLUIPA, the Religious Land Use and Institutionalized Persons Act. None of this has to do with... Well, I don't understand that. I think it has everything in the world to do with it. It doesn't matter whether the oppression of the religious institution comes from an alderman or from the city government. He's part of the government. Right. Well, again, the alderman... You can't be serious about that. If the alderman said, we don't like World Outreach, we like YMCA, that's sort of respectable. That's World Outreach. We don't want that. I don't want that in my ward, right? You'd say, oh, well, that's the alderman.  Is that what you'd say? No, Your Honor. Respectfully, what I was trying to say is that with the particular claim, the only one that's left before the court, that claim has to do with whether there is an implementation of land use law that substantially burden plaintiffs. Therefore, any of these allegations about... Well, I don't understand you. If the alderman says, I don't like this particular sect, World Outreach, it's not my favorite sect, so I don't want it in my ward. Now, would you say that raises no issue under RL UIPA because the alderman isn't in charge of zoning? Is that what you're saying? No, Your Honor. In that case, if there were evidence of discrimination based on the sect's religion, that may fall within the... May? I'm speaking of this hypothetical. What do you mean hypothetical? Why would that be may? Accepting those facts, if the alderman took actions against the group somehow using land use law because he was against their sect and their religion, that would fall under RL UIPA. That's correct, Your Honor. But there's no evidence of that here. There's no evidence here that any of this was based on any bias... Well, what if he just says, well, this provident real estate company donates to my campaign, so I feel an obligation to it, and if it wants this building, I will certainly help it get it, even though it means kicking out the church. That's outside of the statute also? If it didn't involve the use of land use law, then it would be outside the statute. But, of course, it would be affecting the use of the land. It would be affecting the use of the land, but if it wasn't using the city's land use laws to do so, then it wouldn't fall under RL UIPA, which has a narrow definition of what actually falls within Congress's ability to regulate the states, and that is the use of land use law by the states that substantially averted the free exercise of religion. Again, though, there is no evidence of that either. The only evidence here that anyone testified to that the alderman had some sort of personal benefit or interest in this was hearsay evidence testified to by the pastor herself. The alderman himself testified that he was concerned legitimately with what would happen to this property if someone who wasn't financially able to take care of it got the property. I see my time is up. Okay. Well, thank you very much, Mr. Hooper. Mr. Monk, how much time does he have? Four minutes? Thank you, Your Honors. Judge Rovner, we agree with the import of your question that the application for an SRO permit indicates an intention to continue. And Judge Kadeha, it took 30 seconds for any zoning administrator to look on the computer to see that SROs had been permitted use or legally allowed use. That's all the city needed. They could have looked that up. Anybody's use would do? I don't know if they have everybody's use, but we know that this property would. I said anybody's use. Go ahead. Okay. The city wants to put everything. I think Judge Kadeha's question was whether the city knew the use made by YMCA, whether it was an SRO use. Yeah. The city had to know unless they deliberately were closing their eyes. Alderman Beal knew, and Alderman Beal is in effect. The city council makes these aldermen the zoning administrators. And then they say, oh, well, nobody told the zoning administrators. We applied for an SRO permit several times, and the testimony from our paralegal in the affidavit there was that she was told that because the first thing you need is a zoning permit before you can get an SRO. And they looked in the records, and there it was, special use required, and it's in a manufacturing district. So you're just thrown in circles, and it was impossible to comply. Now, why didn't you furnish the drawings when they were asked for? I mean, you have this initial six-month delay, but then your complaint is about a two-year delay. Wasn't the other year and a half because you didn't supply the drawings that they wanted? Well, that's what they say. We eventually, to move this thing along, went back to the YMCA, had them dig through their records, and they found some plans from 1989, and that's what we submitted in 2007, 1989 plans that showed the building. But they already had seen the building. They had hundreds of inspections that said SRO, 168 units. They already knew that. That was a contrived burden by the city. Well, but clarify, were they asking for the plans, the blueprints, whatever, of the existing building, or were they asking for drawings of how your client planned to reconfigure it? We don't know what the city was asking for because there are no standards to prove what you intend to do. There's just a declaration. There's nothing in the code to say how you prove that. So they were coming, well, give us some plans, and we didn't want to spend $10,000 to have an architect draw all these plans, so we dug up some old ones, but it was superfluous, and it was an excuse to say why they'd been litigating this and persecuting our clients and not allowing us to do this. Why do you think they were, if hostility is the word to describe their attitude rather than incompetence or whatever, why do you think they gave World Outreach so much trouble? It goes back to my opening because it threatens the automatic system of absolute control over land use, and the city will go to the mat on anything which cuts into the czarist powers, if I may, of the aldermen to kill housing for Katrina victims. Well, you seem to have to elevate this thing into a giant conspiracy in order to explain your position. I don't quite understand that. Well, the question was why do I think that they did this, and I can't explain all of this hostility and delay except that they've got to protect the system, and the aldermen back each other up, and they rezone these properties manufacturing, and they allow aldermen to kill applications and to kill Katrina housing. It looks to me like a system, and that's what I think it is. Okay, well, thank you very much, Mr. Hoop and Mr. Malk. I'm sorry, Mr. Malk and Mr. Hoffman. Thank you. And the court will take the case under advisement. Thank you.